UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

John Lewis Addison, Jr.,

                    Plaintiff,

vs.

Andrew M. Saul, Commissioner of
Social Security,

                    Defendant.

)
)
)
)
)
)
)
)
)
)

Civil Action No.  5:20-cv-1577-KDW

ORDER

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

     A.     Procedural History

On March 27, 2018,[1] Plaintiff filed an application for DIB alleging disability as of January

25, 2018. Tr. 232-33. Plaintiff's claim was denied initially, Tr. 121, and upon reconsideration, Tr.

139, and Plaintiff requested a hearing, Tr. 159-60. On April 5, 2019, a hearing was held before

Administrative Law Judge ("ALJ") Colin Fritz and testimony was taken from Plaintiff, who was

represented by counsel, and from vocational expert ("VE") Sarah South. Tr. 36-67. On May 21,

2019 the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 16-30. Plaintiff

---

[1] Although the Application Summary references dates in May 2018, as indicated in the Disability
Report and Transmittal, Tr. 121, Plaintiff's protected filing date is March 27, 2018.

requested review of the decision from the Appeals Council, Tr. 213-17. On March 5, 2020 the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review, Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed April 23, 2020. ECF No. 1.

B.      Plaintiff's Background

Born in July 1967, Plaintiff was 50 years old as of his alleged onset date of January 25, 2018. Tr. 251. In his initial Disability Report-Adult form Plaintiff noted that he completed the 12th grade, did not attend special education classes, and has not completed any specialized job training, trade, or vocational school. Tr. 256. Plaintiff listed his past relevant work ("PRW") as automotive crew member (Nov. 1997-Oct. 2014) and military infantry (July 2000-Aug. 2011). *Id.* Plaintiff indicated that he stopped working on October 3, 2014 because of his medical conditions which he listed as: PTSD, knee problem, diabetes, peripheral neuropathy, bipolar, depression, anxiety, and high blood pressure. Tr. 255-56. He indicated he is 5'9" tall, weighed 190 pounds, and his conditions caused him pain or other symptoms. Tr. 255.

An August 6, 2018 Disability Report-Appeal completed by Plaintiff's counsel indicated a change in Plaintiff's medical condition of "higher amounts of pain and mobility loss" that occurred in May 2018. Tr. 275.

C.      Administrative Proceedings

Plaintiff appeared with his counsel in Greenville, South Carolina for his administrative hearing on April 5, 2019. Tr. 36. VE South also appeared and testified. *Id.*

1. Plaintiff's Testimony

In response to questions from the ALJ Plaintiff confirmed that he was 51 years old and his alleged onset date was January 25, 2018 when he was 50 years old. Tr. 39. Plaintiff confirmed that he completed high school. *Id.* Plaintiff testified that he was renting a duplex, his 20-year-old son lived with him, and they had no pets. Tr. 39-40. Plaintiff testified that he has a driver's license and that he drove to the hearing. Tr. 40. Plaintiff confirmed that he has not worked anywhere since 2014. *Id.* The ALJ noted that at a previous hearing the VE identified Plaintiff's PRW as forklift operator; Plaintiff's attorney had no objections to stipulating to that same work history. *Id.* The ALJ noted that Plaintiff's work in the Army Reserves would be outside of the 15-year work history limitation. Tr. 41. The ALJ classified Plaintiff's PRW as forklift operator, Dictionary of Occupational Titles ("DOT") 921.683-050, medium, SVP 3. *Id.*

Plaintiff's attorney noted that the current hearing was to discuss what had changed since Plaintiff's prior administrative hearing. Tr. 41. In response to questions from his attorney, Plaintiff affirmed that he was diagnosed and treated for PTSD and it has worsened since 2018.[2] *Id.* Plaintiff testified that with his PTSD he experienced panic attacks, some anxiety, and difficulty being around more than ten people. Tr. 43. Plaintiff stated that he could be around ten people if they were family, but he would not be able to be around nine strangers. *Id.* Plaintiff stated that he goes to the store early or at midnight to avoid people. *Id.* When asked how he is affected by crowds, Plaintiff testified that he gets "super alert." Tr. 44. The ALJ interrupted to ask Plaintiff whether he went on a cruise to Jamaica with his children and grandchildren in June 2018, and he noted that would seem to be a lot of people. *Id.* Plaintiff responded that he was "surrounded by family" and

---

[2] The ALJ noted that Plaintiff's prior decision was in 2018. Tr. 41. Plaintiff's counsel indicated that Plaintiff's current onset date (January 25, 2018) and the decision date (January 29, 2018) are in conflict, but the intent was that the alleged onset date would be after the decision date. Tr. 42.

did not interact with other people. *Id.* In response to his attorney Plaintiff stated that on the cruise he never went to eat in the dining hall by himself, and that he is okay in a big crowd if he has family with him. *Id.* Plaintiff testified that he goes to church every Sunday, but he has known the people in church for years and after church he does not interact with anyone. Tr. 45. Plaintiff stated that he has a "spot in the back so [he] just sit[s] in the back." *Id.* Plaintiff testified that he has flashbacks, and "certain things trigger it." Tr. 46. Plaintiff testified that if he has a trigger he will just leave and go home—which he considers his safe place. Tr. 47. Plaintiff stated that once home, he will "just read, watch TV." *Id.* Plaintiff indicated that his anxiety attacks are related to the PTSD triggers. *Id.* Plaintiff also testified to having "anger outbursts" and getting into some altercations with people. *Id.* Plaintiff stated that when he was married the police "used to come to the house a lot." *Id.* Plaintiff stated that his psychiatrist had him sent to Marshall Pickens[3] by mandatory court order. Tr. 47-48. Plaintiff described an incident in 2018 where he got into an altercation at a barbershop. Tr. 48. Plaintiff testified that he "apparently" blacked out and he "apparently" cut someone's tires. *Id.* Plaintiff stated that the police were called, and they placed him in the back of the car; but he was not arrested because the barber just wanted Plaintiff to pay for the tires. Plaintiff stated that his "sons came up there and they gave him the money for the tires." *Id.*

Plaintiff stated that when he has an anxiety attack he just gets "real panicky, shaky." Tr. 49. Plaintiff testified that when that happens he "just kind of get to [him]self and focus on something else." *Id.* Plaintiff stated that he has an anxiety attack once or twice a week. *Id.* Plaintiff stated that can keep his PTSD under control because he really does not go anywhere other than to

---

[3] Prisma Health Marshall I. Pickens Hospital is a mental health hospital located in Greenville, South Carolina that offers inpatient and outpatient care of psychiatric, emotional, and psychological disorders. *See* https://prismahealth.org/hospitals/prisma-health-marshall-i-pickens-hospital (last visited June 14, 2021).

church or to his mother's house, so he does not interact with a lot of people to cause a PTSD trigger. Tr. 49-50. Plaintiff confirmed that he experiences anxiety more often than PTSD issues. Tr. 50. Plaintiff stated that he is experiencing depression and he does not want to be "bothered with people" and he just sits in his room and watches TV. *Id.*

Plaintiff testified that since 2018 the problems with his knees have worsened. Tr. 50. Plaintiff stated that his knees "get extremely painful. It's hard to sit and stand for a long time." *Id.* Plaintiff stated that he was told he needed knee replacement surgery, but he was too young to have the surgery now. Tr. 51. Plaintiff confirmed that he was wearing knee braces that he got from the VA, and he has been wearing them for five or six years. *Id.* Plaintiff stated that he wears the braces when he leaves home "to go driving and run the errands . . . ." *Id.* Plaintiff stated that his knees hurt constantly, but he could stand for 10-15 minutes. *Id.* Plaintiff testified that he is able to do household chores, but he takes breaks and will sit in his recliner and watch TV. Tr. 52. He stated that reclining helps with his knee pain. *Id.* Plaintiff stated that he spends "pretty much all day" in his recliner and spends "30 minutes at the most" doing household chores. Tr. 52-53. Plaintiff testified that he goes to the grocery store "[m]aybe twice a month." Tr. 53. Plaintiff confirmed that he receives VA disability payments. *Id.* Plaintiff stated he did not have any difficulty grocery shopping other than going when there were not many people there; Plaintiff added that walking "gets painful" and he can walk 10-15 minutes before having to take a break. *Id.* Plaintiff estimated he could walk 1000 yards before needing to take a break because of pain. He stated that he would need to rest for about five or ten minutes. Tr. 54. Plaintiff stated that if he sits too long his knees stiffen and start to hurt. Tr. 54-55. Plaintiff testified he can sit for 10-15 minutes before his knees stiffen. Tr. 55. Plaintiff stated that the VA has not told him how old he needs to be before he can have knee replacement surgery. *Id.* Plaintiff stated that in the past he has tried injections in his

knees, but they did not work. *Id.* The ALJ interjected to note that he did not see any information in the record to support the need for arthroplasty and Plaintiff's attorney confirmed that he did not have anything other than records noting osteoarthritis in Plaintiff's knees. Tr. 55-56.

Plaintiff testified that he has been given Tylenol for pain but that it does not help. Tr. 56. Plaintiff stated that on an average day his pain level would be at five on a ten-point scale. *Id.* He stated that after walking or standing 10-15 minutes his pain level "can go up to a six, seven." Tr. 56-57. Plaintiff testified that the Tylenol does not help at all, but that is all that he can take because of his mental health medications. Tr. 57. Plaintiff testified that he has heating pads that he uses about twice a week. He stated that he also does leg exercises at home that help keep his legs strong; however, after exercising he experiences a throbbing pain that "could last up to a half hour." *Id.* Plaintiff denied that there was anything else other than PTSD, depression, and his knees that limited his ability to work. Tr. 58. He noted that he has diabetes and high blood pressure, but that they do not bother him much. *Id.* Plaintiff testified he would not take a job like cleaning an office after hours because he "can't be doing that all the time." *Id.* Plaintiff stated, "that's just like cleaning up [his] house [he] won't sit there and [] clean the house all day." *Id.* Plaintiff testified he would not be able to do a job sitting at a desk and scanning documents because of pain from sitting and he would "get really frustrated." Tr. 59. Plaintiff testified that he has difficulty concentrating and he will "be focused on one thing and then [he'll] forget what [he is] doing and end up doing something else." *Id.* Plaintiff confirmed that he has a hard time completing tasks. *Id.*

2. VE's Testimony

Based on the past work as a forklift operator, the ALJ asked the VE to assume a hypothetical individual of younger age with PRW as a forklift operator and with a high school education. Tr. 61. The ALJ posed the following hypothetical:

Hypothetical #1 over the course of an eight-hour workday there are increments with normal and acceptable work breaks this [person] can perform at the light exertional level as defined in the rules and regulations. This person could occasionally climb ladders, ropes, or scaffolds, kneel, crouch and crawl. This person can frequently climb ramps and stairs, balance and stoop. This person can occasionally be exposed to vibrations and hazards associated with unprotected dangerous machine [sic] or unprotected heights. This person concentrate persistent [sic] and maintain pace to understand, remember, and carry out unskilled routine tasks in a low stress work environment we will define as being free of fast paced or team dependent production requirements involving the application of common sense understanding to carry out instructions furnished in written, oral, or dichromatic form. This person can deal with problems involving several concrete variables in or from standardized situations. This person can adapt to occasional workplace changes. This person can perform jobs where they are largely isolated from the general public dealing with data and things rather than people. This person could perform work where the duties could be completed independently from coworkers, but physical isolation is not required. This person can respond appropriately to reasonable and customary supervision.

Tr. 61. The VE confirmed that such an individual could not perform Plaintiff's PRW, but there was other work that could be performed. Tr. 62. The VE identified the following examples: inspector and hand packager, DOT code 559.687-074, light, SVP of 2, unskilled, estimated 315,200 in the U.S. economy; shipping and receiving weigher, DOT code 222.387-074, light, SVP of 2, unskilled, estimated 72,000 in the U.S. economy; and office helper, DOT code 239.567-010, light, SVP of 2, unskilled, estimated 213,800 in the U.S. economy. *Id.*

In his second hypothetical the ALJ modified the exertional limitations in Hypothetical #1 as follows: "this person can still perform work at the light exertional level except that standing and walking combined could be performed for four hours out of an eight-hour workday. Sitting can be performed for six hours out of an eight-hour workday. And we'll limit the bilateral use of foot controls to occasional within the exertional level." Tr. 62. The VE testified that the job examples previously identified would remain but would be reduced by 75%. Tr. 63. The VE stated that the number of inspector and hand packager positions would be 78,800, the number of shipping and

receiving weighers would be 18,000, and the number of office helper positions would be 53,400.
*Id.*

The ALJ divided his third hypothetical into 3A (modifying hypothetical #1) and 3B (modifying hypothetical #2). Tr. 63. The modification was as follows:

> This person can be allowed to sit or stand or adjust positions consistent with the exertional limitations. This person can sit in at least 30-minute increments and could stand and walk in at least 30-minute increments. Now transitioning may cause the individual to be off task while remaining at the workstation no more than 5% of the workday to be beyond normal work breaks. And just for illustrative purposes this would equate for - - to no more than . . . six minutes off task within a two-hour work segment. Additionally, he'd have a need to sit, stand or walk could be accommodated within normal work breaks.

*Id.* The VE testified that if those limitations were added to hypothetical #1 "the three examples would still remain. However, the numbers in the national economy would be reduced by 75% due to positional changes standing and walking." Tr. 64. The VE testified that her answer would be the same if the limitations were added to hypothetical #2. *Id.*

For Hypothetical #4 the ALJ added two additional limitations to all the hypotheticals. Tr. 64-65. The ALJ stated: "So, in addition to limitations set forth in hypothetical 1, 2, 3A and 3B this person can maintain that concentration, persistence, and pace that we discussed earlier now for only 75% of the day. And would be off task an average of 25% of the day beyond normal breaks. Additionally, this person would also be absent from work an average of three or more days per month." Tr. 65. The VE testified that if the two limitations were added to any of the hypotheticals there would not be any work that could be performed. *Id.* The VE testified further that if either one of the two limitations were added to the hypotheticals there would be no work. *Id.* The VE confirmed that her testimony involving reduced standing and walking at the light exertional level and the accommodating reduction in numbers, the sit/stand option, time off task, absenteeism, and assessment of low stress work are not addressed in the DOT or its companion publications. *Id.* She

stated that she based her testimony on her education, training, and knowledge of how jobs are performed. *Id.* The VE confirmed there are no direct or recurrent conflicts between her testimony and the DOT or its companion publications. Tr. 66.

Plaintiff's counsel asked the VE how the available jobs would change if in hypothetical #2 the stand/walk limitation was two out of eight hours, and sitting was six out of eight hours. Tr. 66. The VE testified that would eliminate the job examples because that "would be consistent with a sedentary exertional level." *Id.*

With no other questions, the hearing closed. Tr. 66-67.

II.    Discussion

A.    The Commissioner's Findings

In his May 21, 2019 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019 (C9D).
>
> 2.    The claimant has not engaged in substantial gainful activity since January 25, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*) (C5D-C10D, C14E, hearing testimony).
>
> 3.    The claimant has the following severe impairments: bilateral knee degenerative joint disease, diabetes, affective disorder, and PTSD (20 CFR 404.1520(c)).
>
> 4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.    After careful consideration of the entire record, I find that over the course of an 8-hour workday, in 2-hour increments with normal and acceptable work breaks, the claimant has the residual functional capacity to perform light work (lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday),

as defined in 20 CFR 404.1567(b) except with the following limitations: He can occasionally climb ladders, ropes or scaffolds, kneel, crouch and crawl. He can frequently climb ramps and stairs, balance and stoop. He can occasionally be exposed to vibrations, and hazards associated with unprotected dangerous machinery or unprotected heights. He can concentrate, persist and maintain pace to understand, remember and carry out unskilled, routine tasks, in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements), involving the application of commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. He can deal with problems involving several concrete variables, in or from standardized situations. He can adapt to occasional work place changes. He can perform jobs where the worker is largely isolated from the general public, dealing with data and things rather than people. He can [] perform jobs where the work duties can be completed independently from coworkers; however, physical isolation is not required. He can respond appropriately to reasonable and customary supervision.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 7, 1967 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (*see e.g.* C1F/1).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 25, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. 21-23, 27-28, 30.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the

Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff alleges that (1) the ALJ's unfavorable order is not supported by the longitudinal record, and (2) the ALJ committed reversible error by failing to recontact Plaintiff's treating physician. Pl.'s Br. 3-4, ECF No. 13.

A.     ALJ's Consideration of the Record Evidence

1.   Plaintiff's Mental Impairments

Plaintiff asserts the "ALJ 'cherry-picks' specific portions of the report of consultative examiner, Bruce Kofoed, Ph.D." and disregards other portions of the report which show limitations in social interactions and an inability to work. Pl.'s Br. 3. Plaintiff also contends the ALJ disregarded his VA disability rating. *Id.* at 4. The Commissioner argues that the ALJ's residual functional capacity ("RFC") assessment "amply accounted for Plaintiff's alleged social and stress limitations that were supported by the record (Tr. 61-61)." Def.'s Br. 10, ECF No. 14. The Commissioner also contends that, based on the revised regulations, that ALJ is not required to provide analysis regarding his consideration of the disability decision of a governmental agency other than the Social Security Administration. *Id.* at 10-11.

The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* § 404.1520a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C. The ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations,

the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." *Id.* § 404.1520a(c)(2); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C–H. The ratings for the functional areas consist of a five-point scale: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). SSR 96-8p provides that in assessing a claimant's mental RFC the ALJ should consider "[w]ork-related mental activities generally required by competitive, remunerative work [which] include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." 1996 WL 374184, at *6.

At Step Two of the sequential evaluation process the ALJ determined Plaintiff had the medically determinable mental impairments of affective disorder and PTSD, Tr. 21, but found that these impairments, "considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06," Tr. 22. As required by the regulations, the ALJ documented application of the special technique by incorporating pertinent findings and conclusions as to the degree of limitation in each of the functional areas. Tr. 22-23. The ALJ found Plaintiff had no limitations in the area of understanding, remembering, or applying information; moderate limitation in interacting with others; mild limitation in the functional area of concentrating, persisting, or maintaining pace; and mild limitation in adapting or managing herself. *Id.* As to the moderate limitation in interacting with others, the ALJ noted that Plaintiff alleged "difficulty engaging in social activities, getting along with others, and spending time in crowds." Tr. 22. Citing to Plaintiff's Disability Report, Function Reports, Pre-Hearing Brief, and hearing testimony, the ALJ noted Plaintiff's statements that he is "able to get along with others, shop, spend time with friends and family, attend church, and live with others." *Id.* (citing C2E, C3E,

C6E, C17E, hearing testimony). The ALJ further found that "the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments (C1F, C3F, C5F)." *Id.*

The ALJ concluded his special technique assessment by stating that the limitations he identified are not an RFC assessment but are used to rate the severity of mental impairments, and that his mental RFC assessment at Steps Four and Five required a more detailed assessment. Tr. 23. The ALJ stated that his RFC reflects the degree of limitation he found in the mental functional analysis. *Id.*

### a. Other Facts in Evidence

Plaintiff does not object to the ALJ's findings under the special technique assessment; Plaintiff objects to the ALJ's failure to cite other evidence in the record that Plaintiff alleges does not support his findings. Pl.'s Br. 3. Plaintiff refers specifically to Dr. Kofoed's July 23, 2018 Psychological Evaluation. Dr. Kofoed assessed Plaintiff's social functioning and noted Plaintiff's history of poor social interaction skills. Tr. 330. Dr. Kofoed noted:

> He tends to be irritable and quick to "go off on people." His overall stress tolerance is likely to be poor in a hectic, tense work environment. He may have some difficulty taking instruction. He is likely to do best working alone or working with just one or two people whom he trusts and knows well. He would be prone to irritability with other co-workers, and he would do poorly in a customer service role. It would appear there are moderate impairments in social functioning, not long ago he was incarcerated for a few hours, reportedly for making threatening comments while he was at his psychiatrist's office.

*Id.* Plaintiff seems to contend these comments are inconsistent with the ALJ's special technique assessment and with the finding at Step Five that Plaintiff could perform the jobs of inspector/hand packager, shipping/receiving weigher, or office helper. Pl.'s Br. 3-4. The court disagrees. Dr. Kofoed assessed Plaintiff with "moderate impairments in social functioning"—the same degree of

limitation assessed by the ALJ. Furthermore, Dr. Kofoed did not state that Plaintiff was unable to work. Instead, he outlined the conditions that would make working easier or more difficult for Plaintiff. Based on Plaintiff's affective disorder and PTSD, the ALJ provided the following limitations in his RFC assessment:

> He can concentrate, persist and maintain pace to understand, remember and carry out unskilled, routine tasks, in **a low stress work environment** (defined as being free of fast-paced or team-dependent production requirements), **involving the application of commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form**. He can deal with problems involving several concrete variables, in or from standardized situations. He can adapt to **occasional work place changes**. He can perform jobs where the worker is **largely isolated from the general public, dealing with data and things rather than people**. He can [] perform jobs **where the work duties can be completed independently from coworkers**; however, physical isolation is not required. He can respond appropriately to reasonable and customary supervision.

Tr. 26 (emphasis added). These limitations support the functional assessment of Dr. Kofoed.

Without any explanation, Plaintiff contends the exemplar positions provided by the VE "are outside the recommendations" of Dr. Kofoed. Pl.'s Br. 4. At Step Five, the ALJ noted that Plaintiff's ability to perform the full range of light work was "impeded by additional limitations" and consulted a vocational expert to "determine the extent to which these limitations erode the unskilled light occupational base" and what jobs existed in the national economy for a person of Plaintiff's age, education, work experience, *and RFC*. Tr. 28. The ALJ properly relied on the VE's testimony. *See* SSR 00-4p, 2000 WL 1898704, at *4 (holding that an ALJ may rely on a VE's professional experience); *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980) (finding an ALJ may rely on VE opinion based on training, experience, and familiarity with skills necessary to function in various jobs). Dr. Kofoed did not provide any opinions regarding Plaintiff's inability to perform the identified positions. The court finds that any failure of the ALJ to cite to other statements contained in Dr. Kofoed's report is harmless as the ALJ reached the same conclusion

as the consulting examiner. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (providing that an error is harmless if the ALJ would have reached the same result notwithstanding the error).

b.  The VA Disability Rating

Plaintiff notes that he has a 100% disability rating from the VA resulting from his PTSD, and he argues the ALJ erred by disregarding this disability rating. Pl.'s Br. 4. The Commissioner contends that under the new regulatory framework, the ALJ was not required to provide any additional explanation about the VA's decision. Def.'s Br. 10-11.

Regulation 20 C.F.R. § 416.904 was revised effective March 27, 2017 to note that because decisions made by other agencies were based on their own rules, for claims filed on or after March 27, 2017, the Social Security Administration *would not* provide any analysis about a decision made by any other governmental agency or nongovernmental entity, although it would continue to consider supporting evidence underlying that agency's decision. As Plaintiff's DIB claim was filed on March 27, 2018, the revised regulation applies. Therefore, the ALJ did not err by not considering Plaintiff's VA disability rating. However, the ALJ noted that "VA disability rating notwithstanding, the treatment reports, including diagnostic and examination findings are more persuasive and demonstrate that the claimant is not disabled under the *Social Security Act*, notwithstanding that he otherwise may be entitled to *Veterans Administration* compensation for the same or similar impairments." Tr. 30 (emphasis in original).

"[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d at 1166 (citing *Sitar v. Schweiker,* 671 F.2d 19, 20–21 (1st Cir. 1982)). Here the ALJ considered the evidence in making his mental functional assessment. The ALJ performed the special technique for assessing the severity of a claimant's mental impairments and adequately documented his evaluation of Plaintiff's mental impairments.

Tr. 22-23. In assessing Plaintiff's mental RFC, the ALJ outlined the objective evidence and described Plaintiff's demeanor at the administrative hearing. Tr. 25. Citing to 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p the ALJ evaluated Plaintiff's daily activities as identified in the longitudinal record and as testified to at the administrative hearing. Tr. 26. Upon review of the record, the court finds that the ALJ properly assessed Plaintiff's mental RFC and his conclusion is supported by substantial evidence.

### 2. Plaintiff's Physical Impairments

Plaintiff argues the ALJ erroneously cited to Dr. Kofoed's psychological report when discussing Plaintiff's physical impairments despite Dr. Kofoed's deferral of any discussion of Plaintiff's knee issues to other medical records. Pl.'s Br. 4. Plaintiff also contends the ALJ disregarded his consistent complaints of knee pain. *Id.* (citing Exhibits C3F & C5F). The records cited by Plaintiff are 2018 physical therapy notes from the VA Medical Center. In his first visit on August 13, 2018, Plaintiff complained of "aching" in both knees and rated his pain level at "3 = I have uncomfortable pain, but I can usually tolerate it." Tr. 348-49. Plaintiff was diagnosed with mild chondromalacia bilateral knees. Tr. 351. At his September 10, 2018 physical therapy visit Plaintiff reported that his "knees are sore due to lots of walking while in Mexico." Tr. 341. At his September 27, 2018 visit Plaintiff reported that "pain today in knees when waking this morning was approximately 7 out of 10." Tr. 390. However, after completing a series of physical therapy exercises the therapist noted that Plaintiff was able to do all exercises with the knee braces on and he had no complaints of patellar pain. Tr. 391. At his October 10, 2018 visit Plaintiff reported that he was still having knee pain but his "knees are not as sore as they were before[.]" Tr. 388. The Commissioner argues that in light of Plaintiff's "conservative treatment with physical therapy for his 'mild' knee issues, and his activities, which include performing his own chores, doing pushups,

and taking a cruise to Jamaica and resort trip to Mexico, the ALJ amply accounted for Plaintiff's work-related physical complaints that were supported by the record . . . ." Def.'s Br. 12.

In discussing Plaintiff's bilateral knee degenerative joint disease, the ALJ cited to Dr. Kofoed's report—in addition to other medical evidence in the record—only to note that Plaintiff wore bilateral knee braces. Tr. 24. Despite being unrelated to Plaintiff's mental issues, this was not an inappropriate citation to an observation made by a psychological consultant. The ALJ also determined that "the longitudinal record shows that the claimant's bilateral knee condition is relatively stable." *Id.* The ALJ noted that at the administrative hearing Plaintiff "stated that he uses knee braces only when he goes outside his home and uses only Tylenol for pain." Tr. 25.[5] The ALJ also discussed Plaintiff's daily activities including a June 2018 treatment note that indicated Plaintiff went on a cruise to Jamaica with his family, was active in his church, and helped with his grandchildren and people at church. Tr. 26 (citing Exhibit C5F, found at Tr. 401). The ALJ concluded that "[o]verall, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Tr. 26-27. The ALJ indicated that he considered Plaintiff pain or other symptoms, medication and treatment throughout his RFC analysis and, "viewed as a whole, because the claimant's statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent with the objective medical evidence and the other evidence, I find that the *claimant's symptoms are less likely to reduce his capacities* to perform work-related activities[.]" Tr. 27 (emphasis in original).

Based on review of the record and applicable law, the court finds that the ALJ's decision reflects that he followed the two-step process in SSR 16-3p in evaluating Plaintiff's symptoms.

___

[5] At the hearing Plaintiff testified that on average his knee pain level was a five on a ten-point scale. Tr. 56.

The ALJ also pointed to evidence in the record to support his conclusion. The ALJ did not err in his consideration of Plaintiff's physical impairments and his determination regarding Plaintiff's subjective statements is supported by substantial evidence.

B.    Duty to Recontact Physician

Plaintiff argues that the ALJ erred by failing to recontact his treating psychiatrist, Dr. Larson, as advised by Dr. Kofoed. Pl.'s Br. 4. The Commissioner contends that the ALJ was not required to recontact any provider. Def.'s Br. 13.

In the opening statement of his report, Dr. Kofoed noted: "[Plaintiff] sees Dr. Larson at the VA, although I was not provided with any records from that psychiatrist. It would be advisable to obtain those." Tr. 328. The ALJ obviously had these records as he referenced Dr. Larson's September 2018 mental exam noting that it "was normal, other than [Plaintiff's] mood was reportedly 'up and down' (C5F/31-33)." Tr. 25. If there were other relevant records of Dr. Larson, it was Plaintiff's duty to provide them. *See Bowen v. Yuckert*, 482 U.S. at 146 (noting it is the claimant's burden to show a medically determinable impairment and to furnish medical evidence regarding the condition). Furthermore, at the administrative hearing the ALJ asked if there was any objection to the evidence in the file, and counsel for Plaintiff stated there was no objection. Tr. 38. There was no reason for the ALJ to recontact Dr. Larson. The applicable regulation provides:

> If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

20 C.F.R. § 404.1520b(2). Section (2)(i) provides that an ALJ "*may* recontact [a claimant's] medical source." *Id.* (emphasis added). Here, the ALJ reviewed the evidence in the record and did not find the evidence to be insufficient to determine whether Plaintiff was disabled. Accordingly, he was under no obligation to recontact Dr. Larson.

IV.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

June 22, 2021                                      Kaymani D. West
Florence, South Carolina                          United States Magistrate Judge